J-E01007-18

2019 PA Super 136

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAYMOND DALE PAYNE | : | |
| | : | |
| Appellant | : | No. 604 WDA 2016 |

Appeal from the PCRA Order April 13, 2016
In the Court of Common Pleas of Erie County Criminal Division at No(s):
No. 2562 of 1976

BEFORE: BENDER, P.J.E., PANELLA, J., SHOGAN, J., LAZARUS, J., OLSON, J., STABILE, J., DUBOW, J., KUNSELMAN, J., and MURRAY, J.

DISSENTING OPINION BY SHOGAN, J.: **FILED APRIL 29 2019**

I respectfully dissent. After careful review, I agree with the PCRA court's conclusion that the DNA evidence is neither exculpatory nor would it have changed the outcome of Appellant's degree-of-guilt hearing. Accordingly, I would affirm the April 13, 2016 order denying Appellant's PCRA petition.

In its July 18, 1977 opinion, the lower court set forth the relevant facts and procedural history of this decades-old case as follows:

> [Appellant] was arrested on September 23, 1976 and charged with the slaying of [a minor child ("the victim")].
>
> [The victim], a [sixteen-year-old] student at Strong Vincent High School in Erie, had left her West 10th Street home the morning of August 7th, 1975 apparently headed for the beach. She never returned, and on August 12th her body was found floating in Cuss[e]wago Creek off Route 98 about 12 miles north of Meadville, in Crawford County.

When found the victim's hands and feet were bound by copper wire. Wire also encircled and was imbedded in her neck. Crawford County Coroner Wilbur C. Thomas ruled that the young girl had been strangled listing the cause of death as "acute asphyxiation due to ligature."

The original charge against [Appellant], a teacher at the school attended by [the victim], was originally instituted in Crawford County, the body having been found there. However, on Friday, October 8th, 1976, [Appellant,] with the consent of his attorney and in the attorney's presence, gave a statement to Assistant District Attorney Donald E. Lewis. In the statement in which [Appellant] categorized [the victim's] death as accidental, he revealed that her death had occurred in Erie County. As the result thereof the murder charge was then filed in Erie County on December 8, 1976.

Following several continuances requested by [Appellant] and his counsel, trial was scheduled for Monday, April 11, 1977. On that date [Appellant] entered a plea of guilty to murder generally and a degree[-]of[-]guilt hearing was held before the [lower court *en banc*] on June 7th, 1977. The merits have been argued and the matter is now ripe for decision.

It is the contention of the Commonwealth that the facts require a finding of murder in the first degree. The defense argues that the crime should rise no higher than 3rd degree murder.

Under the plea, voluntary manslaughter could be a possible determination. However, we are of the opinion that there are no facts before the court that would justify that result or require its further consideration.

Section 2501 of the Crimes Code describes criminal homicide as "where a person intentionally, recklessly or negligently causes the death of another person."

Under the amendment to section 2502 of the Crimes Code, effective March 26, 1974, murder is divided into three degrees. "A criminal homicide constitutes murder in the first degree when it is committed by an intentional killing. Murder in the second degree is where the death of the victim occurred while the defendant was engaged as a principal or accomplice in the

- 2 -

perpetration of a felony. All other kinds of murder shall be murder in the third degree.["]

Under sub-section (d) intentional killing "is a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.["]

The evidence before the court consists principally of the physical evidence, the condition of the victim's body, the testimony of the pathologist, [Appellant's] statement of October 8, 1976, and his admissions to his former cellmate, Anthony Lee Evans.

While the defense called two former inmates of the Erie County prison to attack the credibility of Evan[s's] testimony, they relied principally on [Appellant's] version of the victim's death as contained in his statement to the authorities in Crawford County in October of 1976.

In that statement [Appellant] told of meeting [the victim] as she was standing on the corner of Tenth and Raspberry Streets and taking her for a ride. He stated he had been smoking marijuana and had taken two "downs" (meprobamate) prior to meeting the victim; that after voluntarily consuming a number of the pills [the victim] agreed to pose for [Appellant], when he asked her if he could take some "bondage pictures" of her.

He stated that he continued to smoke marijuana as they headed for the Everett C. Hall Community Park, a secluded wooded area in Waterford Township in Erie County.

After arriving there he said that she allowed him to tie her hands and ankles together with some clothesline which he had purchased at the K-Mart. He had the victim get down on her knees. He then tied one end of the rope to a tree, then wound it around her neck and tied the other end to another tree.

At that time he discovered that he had left his camera in his truck; that despite the fact that the girl appeared to be affected by the pills she had consumed, he left her in the trussed[-]up position and returned to his truck.

While there he smoked some more marijuana and loaded his camera. When he returned he discovered that the victim had fallen forward and had expired.

He said he panicked, that he cut the bonds, placed her in his truck and drove her back to his farm; that he then attached cement blocks to her body with some copper wire and placed her in a pond located at the property. Two days later he discovered that the body had surfaced. He then transported the body to the Cussewago Creek where it was found on August 12th.

[Appellant] denied that he had had sexual relations with the victim or that he had in any way molested her.

Counsel for [Appellant] rely on this statement for their defense, contending that [the victim's] death was accidental; that [Appellant] was at most negligent and that his degree of guilt should rise no higher than 3rd degree.

We, however, are not impressed with either the accuracy or credibility of [Appellant's] statement. Yet it does have an important bearing on our determination. Not only does it place [Appellant] alone with the victim when she died, admittedly under circumstances caused by him, but it does in many respects corroborate other evidence introduced by the Commonwealth.

**The most damaging Commonwealth testimony was given by Anthony Lee Evans who was incarcerated along with [Appellant] in the Erie County prison in January and February of 1977.** Mr. Evans testified that [Appellant] confided in him and eventually described in detail what had occurred. **He said that [Appellant] told him that while he and [the victim] were riding in his truck he had put some "downs" (pills) in the victim's beer; that while she was under the influence of the drug he took her to the woods where he tied her up in the manner above described and began having sexual intercourse with her; that she begged him to stop, crying and screaming; that she "made him mad" and he grasped the rope "on each side of her and pulled it tight until she was dead."**

At this point Mr. Evans'[s] testimony varies from [Appellant's] statement in that he testified that rather than taking the body back to the farm and placing it in the pond, that

[Appellant] said he covered the body with leaves and left it there for several days until he decided where to dispose of it.

Evans further testified that [Appellant] told him [the victim's] death was a culmination of a sexual fantasy that he had been living with for a long time; that "he likes to tie women up and do crazy things to 'em."

Evans'[s] testimony corroborates in many respects the statement given by [Appellant] to the Assistant District Attorney of Crawford County.

In both statements he admits that the victim was under the influence of pills ingested either voluntarily or administered by subterfuge.

The reference to a "sexual fantasy" and [Appellant's] penchant for bondage is important, for in [Appellant's] own statement he admits that it was he who suggested the taking of "bondage pictures."

The manner in which [the victim] was tied is exactly the same in both statements.

The only real variation is in the manner in which death was caused. Even here there is verification for Evans'[s] testimony that she died protesting a sexual attack upon her. Paul R. Daube, a chemist employed by the Pennsylvania State Police testified that he conducted tests on Hemorrhogic fluids extracted from the victim's vaginal and anal areas. He stated that he found the presence of seminal acid phosphatase in both areas and that seminal acid phosphatase is found only in semen.

In the opinion of the court the accidental theory advanced by the defense lacks credibility. It is our belief that the testimony of Evans is more consistent with the established facts than the self serving statement of [Appellant].

The specific intent to kill which is necessary to constitute murder in the first degree may be found from the circumstances surrounding the slaying together with all reasonable inferences therefrom.…

> In this case not only do the circumstances point to the conclusion that the slaying of [the victim] was willful, deliberate and premeditated, **but [Appellant's] admission to his cellmate verifies that conclusion and removes all doubt.**
>
> The testimony before the court is also consistent with a slaying in the perpetration of a forceful rape which would constitute murder in the second degree. **However, having concluded that [Appellant] is guilty of an intentional killing, we need not further pursue the theory of felony murder.**

Degree-of-Guilt Court Opinion, 7/18/77, at 1-6 (original emphasis and some capitalization omitted) (emphasis added).

Based on the foregoing, Appellant was convicted of first-degree murder. On August 5, 1977, the lower court sentenced Appellant to a term of life in prison. Appellant filed a notice of appeal, and our Supreme Court affirmed Appellant's judgment of sentence on January 24, 1979. *Commonwealth v. Payne*, 396 A.2d 630 (Pa. 1979).

After several unsuccessful attempts at post-conviction relief, on January 8, 1997, Appellant filed a PCRA petition, which, *inter alia*, requested DNA testing on the seminal fluid recovered from the victim's body. The PCRA court denied Appellant's petition, a panel of this Court affirmed that order, and our Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Payne*, 704 A.2d 1120, 763 PGH 97 (Pa. Super. filed October 28, 1997) (unpublished memorandum), *appeal denied*, 717 A.2d 533 (Pa. 1998). In affirming that PCRA order, this Court stated the following in response to Appellant's contention that he was entitled to DNA testing:

**[Appellant's] assertion that the court relied upon the fact that the victim was raped in its decision to convict him of first-degree murder is not supported by the facts.** The court had several pieces of evidence connecting [Appellant] to this crime, not only his confession. Police traced the wire found on the victim's body to wire found on [Appellant's] property. The court also considered the testimony of [Appellant's] cell mate, Anthony Lee Evans. Evans corroborated much of the story given in [Appellant's] confession, differing only in connection with the manner in which the victim died. Evans testified that [Appellant] had told him about having intercourse with the victim while she was bound to the tree, and that when she begged him to stop he tightened the rope around her neck, strangling her. [Appellant] told his cell mate that this had been a fantasy of his for some time.

The court stated in its Opinion, dated July 18, 1977, that it found [Appellant's] claim that the victim's death was accidental lacked credibility. Rather, the court believed the account of the incident given by Evans. **Thus, the presence of semen, and the identity of the person from whom the semen originated, was not a major consideration in the determination of first-degree murder.** [Degree-of-Guilt Court Opinion, 7/18/77, at 7]. Accordingly, we will not find that a miscarriage of justice has occurred in this case.

*Payne*, 763 PGH 97 (unpublished memorandum at *4-5) (emphases added).

Thus, the semen evidence, from which the DNA evidence was obtained, was not the *sine qua non* of first-degree murder. This Court has already held that the facts do not support Appellant's assertion that the first-degree murder gradation was based on a rape. *Id.* at *4.

On February 6, 2003, Appellant filed a motion for DNA testing pursuant to a then newly passed statute, 42 Pa.C.S. § 9543.1, the PCRA provision permitting DNA testing under certain circumstances. The PCRA court denied that motion, and Appellant filed a notice of appeal to this Court. On November 18, 2003, a panel of this Court affirmed the order of the PCRA court, and on

May 11, 2004, our Supreme Court denied Appellant's petition for allowance of appeal. ***Commonwealth v. Payne***, 841 A.2d 577, 762 WDA 2003 (Pa. Super. filed November 18, 2003) (unpublished memorandum), *appeal denied*, ___ A.2d___, 626 WAL 2003 (Pa. filed May 11, 2004).

Specifically, this Court pointed out that

[e]ven if one credits [Appellant's] contention that DNA evidence would call into question the sexual assault, which [Appellant] contends was used as an aggravating factor leading to his conviction for first degree murder,[2] there is no question in this case concerning the "identity of the perpetrator."  Hence, there is no basis for [Appellant] to obtain relief under this section.

> [2] It bears mention that [Appellant] did not plead guilty, nor was he convicted of any sexual offense.

***Payne***, 762 WDA 2003 (unpublished memorandum at *3).

On September 9, 2011, Appellant filed a second motion for DNA testing pursuant to Section 9543.1.  On October 4, 2011, the PCRA court denied relief. Appellant filed a notice of appeal to this Court, and on July 31, 2012, this Court affirmed the order denying Appellant relief.  On July 12, 2013, our Supreme Court denied Appellant's petition for allowance of appeal. ***Commonwealth v. Payne***, 55 A.3d 152, 1717 WDA 2011 (Pa. Super. filed July 31, 2012) (unpublished memorandum), *appeal denied*, 69 A.3d 601 (Pa. 2013).

Meanwhile, on May 16, 2011, Appellant filed a complaint in the United States District Court for the Western District of Pennsylvania against the Erie County District Attorney's Office alleging violations of 42 U.S.C. § 1983 for its

refusal to permit DNA testing. On December 16, 2014, the federal district court signed a stipulated order permitting post-conviction DNA testing. The DNA test results established conclusively that Appellant was excluded as a contributor to the seminal fluid found on the victim's body.

On August 21, 2015, Appellant, through counsel, filed a PCRA petition asserting that he is entitled to a new trial or degree-of-guilt hearing based on this after-discovered evidence. Appellant's eligibility for relief is premised on 42 Pa.C.S. § 9543(a)(2)(vi), and satisfaction of the requirement that Appellant's conviction resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." PCRA Petition, 8/21/15, at 2. The Commonwealth filed a response to the petition, and on April 13, 2016, the PCRA court entered a final order and opinion denying Appellant relief. The PCRA court found as follows:

> Here, [Appellant] has failed to show the DNA evidence was exculpatory and would have changed the outcome of the proceedings. As discussed *supra*, our appellate courts have previously determined that presence of semen and the identity of the donor of the semen were not determining factors in finding [Appellant] guilty of first-degree murder. Furthermore, [Appellant] was not convicted of any sexual offense….
>
> **The evidence, including [Appellant's] statement to Crawford County District Attorney Donald Lewis and his concealment of [the victim's] body, clearly established [Appellant's] guilt of first-degree murder; accordingly, the DNA evidence would not have changed the outcome.**

PCRA Court Opinion, 4/13/16, at 8-9 (emphasis added) (footnote omitted).

- 9 -

Appellant timely filed a notice of appeal, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents three questions for our review.

[1.] Did the PCRA court err in finding that [after-]discovered DNA evidence was not likely to change the outcome of [Appellant's] criminal proceeding notwithstanding that the [after-discovered] evidence rebuts the Commonwealth's overall theory of the case and disproves a key inference that the prosecution and finder of fact relied on to establish the intent necessary for conviction?

[2.] Did the PCRA court err to the extent that it held the [after-] discovered evidence was immaterial or not exculpatory?

[3.] Did the PCRA court err by not considering [Appellant's] claims under the United States and Pennsylvania constitutions?

Appellant's Brief at 4.

On appeal from the denial of PCRA relief, the standard of review requires that this Court determine whether the ruling of the PCRA court is supported by the record and free of legal error. **Commonealth v. Lewis**, 63 A.3d 1274, 1278 (Pa. Super. 2013). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." **Id.** Moreover, "[t]he PCRA court's credibility determinations, when supported by the record, are binding on this Court." **Commonwealth v. Wholaver**, 177 A.3d 136, 144 (Pa. 2018).

In Appellant's first issue, he avers that the PCRA court erred in concluding that after-discovered DNA evidence likely would not change the outcome of Appellant's degree-of-guilt hearing. Relevant to this claim, Section 9543(a)(2)(vi)

provides for post-conviction relief where a petitioner could prove a claim of newly discovered **exculpatory** evidence. In order to succeed on such a claim, the petitioner must establish by a preponderance of the evidence that:

> (1) the evidence has been discovered after the trial and it could not have been obtained at or prior to trial through reasonable diligence;
>
> (2) such evidence is not cumulative;
>
> (3) it is not being used solely to impeach credibility; and
>
> (4) such evidence would likely compel a different verdict.

***Commonwealth v. Fiore***, 780 A.2d 704, 711 (Pa. Super. 2001) (emphasis added).[1]

As noted above, Appellant contends that the PCRA court erred in concluding that this after-discovered evidence would not have changed the outcome of Appellant's degree-of-guilt hearing. Appellant's Brief at 22-40. Specifically, Appellant argues that the

> new evidence at issue here directly undermines the inferences used against [Appellant] to secure a conviction forty years ago. In advancing the credibility of its jail-house informant and seeking to undermine [Appellant's] explanation, the Commonwealth created a strong inference that seminal fluid found in the victim was [Appellant's]. That evidence and inference were critical reasons why the [degree-of-guilt court] found the intent necessary to render a verdict of first-degree murder. [Appellant's]

---

[1] In this case, there is no dispute that the evidence was not available, nor could it have been available, at the time of trial. Additionally, this evidence is neither cumulative nor being used solely to impeach credibility. Moreover, it is well settled that a change in the outcome of a degree-of-guilt hearing is a change in the verdict as contemplated by the PCRA. ***Commonwealth v. Bonaccurso***, 625 A.2d 1197, 1201 (Pa. Super. 1993).

- 11 -

conviction, however, cannot stand in the face of modern analysis proving that the seminal fluid was not his after all.

*Id*. at 30. As panels of our Court have concluded in prior appeals of this case, none of this is accurate.

Essentially, Appellant is arguing that this after-discovered evidence created reasonable doubt as to the specific-intent-to-kill element of first-degree murder. "Specific intent and malice may be inferred through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." **Commonwealth v. Hicks**, 156 A.3d 1114, 1124 (Pa. 2017). In **Commonwealth v. Pruitt**, 951 A.2d 307 (Pa. 2008), and **Commonwealth v. Keaton**, 729 A.2d 529 (Pa. 1999), our Supreme Court upheld first-degree murder convictions and found that the defendants possessed a specific intent to kill under similar circumstances.

In **Pruitt**, the defendant admitted to breaking into the home of a sixty-nine-year-old woman, covering her mouth with a towel, tying it, removing her clothing, tying her up, and leaving her there "while he went upstairs to look for money." **Pruitt**, 951 A.2d at 314. "When he came back downstairs with the victim's money, she was not moving." **Id**. The forensic pathologist testified that the victim's death was caused by "strangulation, most likely with the towel that was found around her neck." **Id**. Our Supreme Court held that the "evidence is sufficient to support the *mens rea* element of first-degree murder, *i.e.*, a specific intent to kill." **Id**. Specifically, the **Pruitt** Court stated that "this Court has held on several occasions that evidence of death by

strangulation can be sufficient to establish the requisite intent for first-degree murder." **Id.** (citing **Commonwealth v. Mitchell**, 902 A.2d 430, 445 (Pa. 2006); **Commonwealth v. Simmons**, 662 A.2d 621, 629 (Pa. 1995)).

Similarly, in **Keaton**, police found the partially decomposed body of the victim, a former girlfriend of Keaton's, in a basement of a house known for crack-cocaine activity. A "pair of tights was tied tightly around her neck as a ligature." **Keaton**, 729 A.2d at 534. The autopsy revealed the victim had recently used alcohol and cocaine. Keaton admitted to having tied up the victim, "but claimed it was merely part of a 'sex game.'" **Id**. at 535. He also admitted to having left the victim unconscious and tied up in the basement while he left the house to obtain more drugs. Keaton claimed that the evidence was insufficient to sustain a first-degree murder conviction because he did not intentionally kill the victim. Our Supreme Court found Keaton's argument unavailing and stated that "the act of tightening a strap around a person's neck, with enough force and violence to kill the victim, [is] sufficient to permit a finding of specific intent to kill." **Id**. at 537. Additionally, this Court took into account the fact that Keaton left the victim tied up "on the floor, unconscious in the pitch black of the basement." **Id**.

Herein, Appellant confessed and admitted to his role in the death of the victim. According to Appellant, he provided drugs to the victim, **tied her up in a way that included suspending her between two trees with a rope bound around her neck and her hands tied behind her back**, and left

- 13 -

her in that position. The bindings that Appellant secured around the victim's neck caused her death. As in **Pruitt** and **Keaton**, these facts are sufficient to establish a specific intent to kill to support a first-degree-murder conviction.

Moreover, "[a]ctions of the accused that occur before, during, and after are admissible as evidence to show malice." **Commonwealth v. Gonzalez**, 858 A.2d 1219, 1223 (Pa. Super. 2004) (emphasis in original). "[E]vidence of acts to conceal a crime, such as disposing of the victim's body, are relevant to prove the accused's intent or state of mind." **Commonwealth v. Dollman**, 541 A.2d 319, 322 (Pa. 1988).

By his own admission, Appellant went to great lengths to conceal the victim's body. Appellant admitted he used cement blocks and copper wire to submerge the victim's body in a pond on his property. After her body re-surfaced, he transported her to another location and tried to submerge her body again. Mr. Evans testified Appellant had relayed to him that when he threw the dead body into the water, it was the climax to his sexual fantasy, and Appellant said, "[H]e shot off all over himself." N.T., 6/7/77, at 59.

Mr. Evans's testimony was contrary to Appellant's version of events where Appellant stated that he "panicked" when the victim died. Moreover, Mr. Evans did not testify that Appellant ever ejaculated on or inside the victim; rather, Mr. Evans used a more vulgar statement saying that "[Appellant] shot off all over himself." N.T., 6/7/77, at 59. Mr. Evans also testified that Appellant confessed that while he began having intercourse with the victim,

she made Appellant mad so he strangled her with the rope, pulling the rope tight until she was dead. *Id.* at 55-56.

Based on the evidence, Appellant's statements, and the testimony of Mr. Evans, which the court found credible, I conclude that the outcome of the degree-of-guilt hearing would not have been different even if the results of the DNA testing had been available because the evidence established Appellant's intent to kill the victim. As discussed above, the degree-of-guilt panel found Mr. Evans credible because his version of events made more sense that Appellant's self-serving statements. Mr. Evans testified that Appellant ejaculated on himself, not inside or on the victim. Moreover, Appellant was not convicted of rape, and the DNA evidence does not diminish the degree-of-guilt panel's credibility assessment. Accordingly, I would find that Appellant is entitled to no relief on his first claim of error.[2]

---

[2] Appellant avers that the 1977 degree-of-guilt court opinion "clearly based the finding of *intentional* strangulation on evidence of seminal fluid found in the victim." Appellant's Reply Brief at 3. This is wrong. As noted, the degree-of-guilt court found that

> [t]he specific intent to kill which is necessary to constitute murder in the first degree may be found from the circumstances surrounding the slaying together with all reasonable inferences therefrom.…
>
> In this case not only do the circumstances point to the conclusion that the slaying of [the victim] was willful, deliberate and premeditated, **but [Appellant's] admission to his cellmate verifies that conclusion and removes all doubt**.

- 15 -

Appellant next argues that the PCRA court erred in concluding that the DNA evidence was neither material nor exculpatory.[3] Appellant's Brief at 40-49. Specifically, Appellant suggests that the PCRA court erred by considering evidence not of record. First, Appellant criticizes the PCRA court for creating a "newly-minted theory" regarding the perpetrator of this crime. Appellant's Brief at 42. Appellant takes issue with the following conclusion set forth by the PCRA Court:

> The presence of DNA material of another male does not help [Appellant's] case, it hurts it. In this court's view, the DNA evidence of another male is more inculpatory than ever, strongly suggesting that [Appellant] had an undisclosed partner in his depraved, murderous endeavor.

PCRA Court Opinion, 4/13/16, at 12). Additionally, Appellant disagrees with the PCRA court's conclusion that "the primary use of the DNA evidence is for impeachment: to quibble with the verdict and Evans'[s] credibility." *Id*. (footnote omitted).

_____

Degree-of-Guilt Court Opinion, 7/18/77, at 6 (emphasis added). These findings reveal that the degree-of-guilt court relied on the credible testimony of Mr. Evans and not exclusively or "clearly" on the presence of seminal fluid. As noted, excluding the evidence of semen does not exculpate Appellant of first-degree murder; it does not even exonerate Appellant of sexually assaulting the victim.

[3] Because I conclude that the outcome of Appellant's criminal proceedings would not have been different, it is unnecessary to address this argument because Appellant did not meet the criteria for a new trial based upon after-discovered evidence. *Fiore*, 780 A.2d at 711. However, I address the remaining issues in an effort to clarify my position.

While I agree with Appellant that the PCRA court erred with respect to these conclusions, I cannot agree that this entitles Appellant to relief. In considering both the materiality and the exculpatory nature of the DNA evidence, the presence of semen in the victim's body from someone other than Appellant **could** implicate an accomplice, as the PCRA court suggested. However, it is equally likely that this evidence could lead to the conclusion that the victim had sexual intercourse, consensual or otherwise, with someone other than Appellant or an accomplice.

Furthermore, the presence of semen from someone other than Appellant is in no way exculpatory as to Appellant's first-degree murder conviction. In DNA testing cases, "a test that is favorable to the petitioner does not guarantee acquittal. An absence of evidence is not evidence of absence." ***Commonwealth v. Kunco***, 173 A.3d 817, 824 (Pa. Super. 2017). As I have repeatedly noted above, rape was never the basis for first-degree murder.

The fact that the semen found in the victim did not match Appellant's DNA is not an exoneration. Simply stated, the DNA evidence does not exculpate Appellant of first-degree murder, and it does not necessarily prove that Appellant did not sexually assault the victim. In other words, Appellant could have sexually assaulted the victim without leaving semen in or on the victim's body. The only fact of which the DNA is conclusive is that Appellant's DNA was not found inside or on the victim. Thus, despite the PCRA court's speculation concerning a third party, I agree that Appellant is not entitled to

PCRA relief based on the absence of a DNA match to Appellant. I reiterate that Appellant's cellmate, Mr. Evans, testified and his testimony was found credible. As an appellate court, we do not disturb credibility determinations that are supported by the record. **Wholaver**, 177 A.3d at 144. I discern no error in the degree-of-guilt panel finding that Mr. Evans was credible, and I conclude there is no basis upon which to disturb the panel's findings of credibility.

Although the DNA taken from the seminal fluid found on the victim does not match Appellant, the semen was but one factor at Appellant's degree-of-guilt hearing. The Majority states that "[t]he proper focus is whether the after-discovered evidence significantly refutes an assertion on which the Degree of Guilt Panel and the Commonwealth placed significant weight." Majority Opinion, at 4. However, the Majority cites no authority for this parallel "significance" standard. Additionally, the Majority errantly states that the degree of guilt panel "placed significant weight on the theory that Appellant murdered the victim **while raping her**." Majority Opinion, at 11 (emphasis added). As I pointed out *supra*, there was no finding of rape, and the semen evidence was not the lynchpin of the degree-of-guilt panel's conclusion. **See Payne**, 763 PGH 97 (unpublished memorandum at *4) ("**the presence of semen and the identity of the person from whom the semen originated, was not a major consideration in the determination of first-degree murder**"). Once again, I emphasize that:

> The testimony before the court is also consistent with a slaying in the perpetration of a forceful rape which would constitute murder in the second degree. **However, having concluded that [Appellant] is guilty of an intentional killing, we need not further pursue the theory of felony murder.**

Degree-of-Guilt Court Opinion, 7/18/77, at 7 (emphasis added). Reviewing this statement, it cannot be concluded that the degree-of-guilt panel "significantly relied" on the rape theory; rather, the rape theory was espoused purely as a possible alternative basis for conviction.

The absence of a DNA match does not establish Appellant's innocence—Appellant's argument is an indictment of Mr. Evans's testimony and the PCRA court's credibility determinations. Were it necessary to address this issue, I would conclude that Appellant is entitled to no relief.

Finally, Appellant claims that the PCRA court erred by not addressing Appellant's "claim that his constitutional rights independently compel a new trial." Appellant's Brief at 49. Appellant argues the following:

> [Appellant] has been imprisoned for almost forty years under a theory based on evidence of seminal fluid that we now know was wrongly used against him. The newly discovered DNA evidence dramatically undercuts the claim that he murdered [the victim] in the course of a sexual assault and creates reasonable doubt as to the element of intent. The PCRA court did not, however, address [Appellant's] claim that his continued incarceration despite this new evidence violates due process under the United States and Pennsylvania Constitutions. For that reason as well, this Court should at the very least remand for further proceedings.

Appellant's Brief at 50-51.

Although he phrases this argument in terms of his rights under the United States and Pennsylvania Constitutions, Appellant's argument, in reality, is a catchall claim suggesting that this Court should remand for the PCRA court to reconsider its decision. I am satisfied that the review conducted by this Court and the PCRA court provided the protections Appellant is afforded under the United States and Pennsylvania Constitutions. The DNA evidence does not prove, as Appellant suggests, that he is innocent of first-degree murder—it does not even prove that he did not sexually assault the victim.

In conclusion, the degree-of-guilt panel relied significantly on Mr. Evans's testimony. Degree-of-Guilt Court Opinion, 7/18/77, at 6. The newly discovered DNA evidence does not disturb or negate the degree-of-guilt panel's determination that Mr. Evan's was credible. **Wholaver**, 177 A.3d at 144. I discern no error in the degree-of-guilt panel's reliance on Mr. Evans's testimony, and I conclude that this testimony supported a finding of first-degree murder. As noted herein, the absence of Appellant's DNA does not prove that Appellant did not sexually assault the victim, and I do not find that the result of the underlying proceedings would have been different even in light of the DNA evidence.

For the reasons set forth above, I would affirm the decision of the PCRA court. Therefore, I respectfully dissent.

Judges Olson and Stabile join this Dissenting Opinion.