**[J-11-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 698 CAP |
| | : |
| Appellee | : Appeal from the Judgment of Sentence |
| | : entered on 03/12/2014 in the Court of |
| | : Common Pleas, Criminal Division of |
| v. | : Fayette County at No. |
| | : CP-26-CR-0002075-2011 |
| | : |
| PATRICK RAY HANEY, | : SUBMITTED:   February 25, 2015 |
| | : |
| Appellant | : |

**OPINION**

**MR. JUSTICE STEVENS**                    **DECIDED:   December 29, 2015**

This is a capital direct appeal from the judgment of sentence imposed after a jury convicted Patrick Ray Haney ("Appellant") of, inter alia, first-degree murder.   For the following reasons, we affirm Appellant's conviction and judgment of sentence.[1]

**I.  FACTS AND PROCEDURAL BACKGROUND**

On September 13, 2011, Heather Forsythe ("Forsythe") and Appellant presented at Ruby Memorial Hospital in Morgantown, West Virginia with Forsythe's four-year-old son, Trenton Lewis St. Clair ("Trenton").   N.T. 3/10/14, jury trial, at 41, 49, 133.   When Trenton arrived, he had neither a pulse nor signs of life.   N.T. 3/11/14, jury trial at 162-63.

---

[1]  This Court automatically reviews direct appeals from the imposition of death sentences pursuant to 42 Pa.C.S. § 9711(h)(1).

Forsythe and Appellant told emergency personnel that Trenton had fallen down a flight of stairs. Id. at 170. Dr. Hollyn Larabee ("Dr. Larabee"), a doctor at Ruby Memorial Hospital's Department of Emergency Management, immediately attempted to resuscitate Trenton and was able to restart his heart four times; however, she was not able to keep the heart beating. Id. at 163. After an hour and twelve minutes of attempting to resuscitate him, Dr. Larabee pronounced Trenton dead. Id. at 164.

At trial, Dr. Larabee testified that it was "immediately evident that the child had been beaten. He was covered in bruises. There was blood around his mouth." Id. at 163. As a result of these observations, Morgantown Children and Youth Services and Morgantown State Police were summoned to the hospital. State Police Troopers James Pierce, Daniel Barnhart, and Charles Morrison arrived at the hospital at approximately 9:55 p.m. and interviewed Dr. Larabee, Forsythe, and Appellant. N.T. 3/10/14, jury trial, at 133-34. Appellant initially told troopers that Trenton had fallen down the stairs at approximately 1:00 a.m. that day and that the child "seemed fine" until approximately 2:00 or 3:00 p.m. that afternoon when he began to throw up and act "funny." Id. at 134-35. Appellant further told troopers that Trenton had fallen off a desk and had fallen off a drawbridge at the park a few days prior to his death. Id. 135.

During her interview with the troopers at the hospital, Forsythe requested to speak with the officers at the police barracks, as she was afraid that Appellant was outside the room listening. Id. at 52, 137. At trial, the Commonwealth introduced text messages Forsythe sent her step-niece as she was being transported to the police barracks which read: "Not good. I'm doing myself in as well as -- as soon as I do what I got to do. I have no reason here anymore." Id. at 58. Forsythe continued in another text:

I'm on my way to the police station now. Trenton was beat they told me and that he was choked, that is the reason he is dead, because I would never hurt my baby. I only know that I feel in my heart that the bruises all over him -- I would never hurt my baby. He would tell me when he would have a new bruise or something and Pat would say he fell or he was climbing and shit. What else can I say.

Id. at 58-59. Upon arrival at the barracks, Forsythe gave a written statement to police explaining that she had observed Appellant physically abusing Trenton on September 10, 2011. Id. at 54.

The state police transported Appellant to the police barracks, and Trooper Pierce testified that while transporting him, Appellant engaged in conversation with the troopers, speaking about his childhood, where he grew up, and how he met Forsythe. Id. at 136. However, Appellant did not mention Trenton at any point. Id. Once at the barracks, Appellant was placed in an interview room where he sat while the troopers interviewed Forsythe. After Forsythe gave her written statement to police, at approximately 3:30 a.m. Trooper Pierce provided Appellant with his Miranda[2] rights, which Appellant acknowledged. Id. at 137-38. Trooper Pierce then informed Appellant that Trenton was deceased and asked if he knew how it had happened, to which Appellant responded that Trenton had fallen down the steps. Id. at 141.

Trooper Pierce explained to Appellant that Dr. Larabee had indicated she believed that Trenton's injuries were caused by abuse, not by multiple falls, and the trooper provided Appellant with a copy of Forsythe's written statement. Id. At trial, Trooper Pierce testified that upon reading Forsythe's statement, Appellant "dropped his head and

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1969).

he appeared to start crying.   I asked [Appellant] if he ever struck Trenton and he replied that he struck Trenton on the back of the head and slapped him across the face." Id. 142.   When asked why he would strike Trenton, Appellant replied that Trenton wouldn't listen and that the slaps were meant to discipline him, not to hurt him. Id.   When Trooper Pierce questioned whether Appellant felt remorse for Trenton's death, Appellant replied, "[o]f course I feel remorse, he was only four years of age." Id.   Appellant was charged with first-degree murder[3] and child endangerment. [4,5]

At trial, Forsythe testified that in early September of 2011, she and Trenton were living in a home on Morgantown Road in Point Marion with Appellant and his father, Patrick Ray Haney, Sr. Id. at 41.   In the first few weeks of September, Forsythe began noticing bruises on Trenton's body.   When Forsythe questioned Appellant about the origin of the bruises, Appellant "would say he fell, or he was climbing, or fell, or running, tripped, whatever." Id. at 42-43.   In the week leading up to Trenton's death, Forsythe noticed the bruises were increasing in number, but Appellant would again provide similar explanations for the injuries. Id. at 43.

On September 10, 2011, Forsythe arrived home after attending a funeral, "heard a ruckus upstairs" and observed Appellant standing above Trenton.   Appellant was hitting, slapping, and kicking Trenton, while the child cried. Id. at 44.   Forsythe testified that the

---

[3] 18 Pa.C.S. § 2502(a).

[4] 18 Pa.C.S. § 4304(a)(1).

[5] Following her statement to police, Forsythe was initially charged with homicide and child endangerment.   Forsythe later pled guilty to child endangerment, and the Commonwealth agreed to drop the homicide charges in exchange for her testimony against Appellant.   N.T. at 59.

incident left red marks on Trenton's body.  Id. at 45.  In the days after this attack, Trenton complained of a stomach ache.   Forsythe testified that during this time Appellant would not allow her to leave the home or make any phone calls.   Id. at 45-46.

On September 13, 2011, Trenton's condition worsened and he began vomiting. Forsythe testified she sent a text message to Appellant around 4:00 p.m. that day that read:

> My son has bruising all over him.   He can't keep even water
> down or food.   I can't take him to the doctor.   I am a piece of
> shit mother.   I can't even say how these bruises got there and
> I'm not going to take and lose him because of him [sic].

Id. at 48.[6]   Shortly thereafter, Appellant agreed to take Trenton to the hospital, but did not allow Forsythe to call 911, claiming that he could get them there faster.   While driving to the hospital, Appellant repeatedly told Forsythe he was sorry and that he was going to go

---

[6] The Commonwealth further introduced into evidence the content of a text message Forsythe sent to Appellant on September 3, 2011, ten days prior to Trenton's death.   The message read:

> I'm depressed and you yell at me and shit rather than notice --
> you notice or not.   You have been belittling me.   You treat
> me at times like I'm stupid.   You make comments that you
> hate kids, you can't stand them and you don't want any.
> What if I get knocked up, Pat?   Do you not see it from my
> side?   Trenton is my only child, he is my miracle, and you say
> things like that to me.   There is [sic] many times I could have
> lost him.   He is my miracle and I love my son with all my
> heart, nothing can change that.   Then you talk about shit
> about sending him away from me. That would be like asshole
> taking him from me.   It would feel the same way to me.   He
> loves you and hears you say them [sic] things and cry to me
> that you want him to leave and he asks me if I'm going too.
> He's only four.   He has a lot to learn.   You're the only dad he
> has.

Id. at 72-73.

to jail.  Id. at 49.  During the drive, Forsythe and Appellant decided to tell the hospital staff that Trenton had fallen.  Id. at 50.  Trenton stopped breathing on the way to the hospital, and Forsythe attempted to perform cardiopulmonary resuscitation ("CPR") in the car.  Id. at 48.

The Commonwealth presented testimony from Dr. Matrina Schmidt ("Dr. Schmidt"), whom both parties accepted as an expert in the field of Forensic Pathology, regarding her autopsy of Trenton.  Dr. Schmidt recited Trenton's injuries as follows:

> On the forehead, in the face, there were contusions.  There [were] contusions on the forehead, there [was] a contusion below the right eye, there were contusions on the right jaw line extending onto the neck, there were contusions on the left cheek, the left face, the left jaw line, and also on the left side of the neck.  There were contusions on the chest, the abdomen, there were contusions on the back and the buttocks and there were contusions on the right and left arms and right and left legs.

Id. at 83.  Dr. Schmidt continued to explain that contusions are considered bruises, and that some of the many bruises on Trenton's body were circular in nature and consistent with finger impressions.  Id. at 84.  The Commonwealth showed Dr. Schmidt pictures taken of Trenton prior to the autopsy and asked that Dr. Schmidt explain the external injuries portrayed in each picture.  Id. at 84-89.

Dr. Schmidt testified to the findings she made during her internal examination. Specifically, Dr. Schmidt explained that the internal examination revealed a deep scalp hemorrhage, an exudate on the small intestines, a contusion on the small intestine, a hematoma on the right side of the abdomen, and acute inflammation of the small intestines, large intestines, and bladder.  Id. at 91-93.  Dr. Schmidt further testified that she found "early formation of fibroblast formation, fibroblast coming in a form of

supporting membrane" in some of Trenton's injuries, which is a sign of healing. Id. at 93-94. Dr. Schmidt further explained that "the hematoma that was found in the abdominal cavity occurred at a different time than the peritonitis or the exudate that I saw, observed on the intestines." Id. at 94. Dr. Schmidt testified that Trenton would have been experiencing lethargy, a fever, nausea, vomiting and severe abdominal pain due to the peritonitis. Id. at 95.

Dr. Schmidt testified she determined Trenton's death to be caused by "peritonitis due to closed abdominal injury due to battery," and although she could not rule out a fall down the steps as the cause of the peritonitis, the injuries that she observed on Trenton were not consistent with injuries that would be found on a four-year-old child who had fallen. Id. at 96, 101. Dr. Schmidt explained, "the bruises are scattered all over in [a] pattern and some of them are circular that look like finger impressions, and you wouldn't expect to see bruises, like, just from a fall." Id. at 96-97. Accordingly, Dr. Schmidt stated with a reasonable degree of certainty within the forensic pathology field that the manner of death was homicide. Id. at 97.

Dr. Larabee also testified at trial as an agreed upon expert in the field of Emergency Medicine. Dr. Larabee testified that Trenton was "essentially dead" when he arrived at the hospital, and that "it was immediately evident that the child had been beaten." N.T. 3/11/14, jury trial, at 162-63. Dr. Larabee described Trenton's external injuries, as described by Dr. Schmidt, and added that Trenton's stomach was noticeably distended, meaning it was firm and pushed out, a condition which is not normal for a thin, healthy child. Id. at 167.

When asked to describe the significance of bruises that are circular in nature, Dr. Larabee explained:

> These injuries appear to a trained physician to obviously be secondary to intentional trauma. They appear to be secondary to fingerprints to the hand. It is very unusual to see circular bruises to those parts of the body to soft tissue, the neck, the stomach, the chest, the buttocks are not areas, the low back, where you should see bruises on children. You should see them on elbows and on the shins from normal activities.

Id. at 169-170. On cross-examination, Dr. Larabee conceded that she could not give an opinion as to whether a man or woman would have caused the circular bruises. Id. at 175.

Moreover, Dr. Larabee testified as to the abnormality of an abdominal bruise:

> So most bruises whether its children or adults occur when the skin is caught between a hard surface and a bone. So the bruise is because you fall and hit something and so the bone and the surface contract and the skin is caught between and that causes the bruise. It's unusual specifically over the abdomen, there's no bones to create that bruise against so it's much harder, it takes a great deal of force to create bruises over a soft tissue like the abdomen, the buttocks, the neck.

Id. at 170. When asked whether the injuries that she observed on Trenton were consistent with a child that had fallen down the stairs, Dr. Larabee responded, "It is absolutely not consistent with a child falling down the steps." Id. at 171. On cross-examination, Dr. Larabee reiterated that she has never seen an injury pattern like Trenton's from a fall down the stairs. Id. at 177. Dr. Larabee was further questioned whether any of Trenton's injuries could have been consistent with a fall off a jungle gym or a child who fell off an all-terrain vehicle ("ATV"), to which she consistently responded in the negative. Id. at 171-72. Dr. Larabee further testified that Trenton's bruises

appeared to be different ages, with some appearing to be not more than two to three days old, while others appeared to be not less than six to twelve hours old. Id. at 173.

Dr. Larabee testified that peritonitis is very treatable when detected at an early stage, and had Trenton been brought to the hospital earlier, he "likely would have survived." Id. Ultimately, Dr. Larabee determined that Trenton died of "intentional injury, non-accidental trauma, child abuse." Id. Finally, Dr. Larabee testified that "I've had a lot of time to think about this. It's without a doubt the wors[t] case I've ever seen and I have had other children die of non-accidental traumas. This is the wors[t] case I've ever seen." Id. at 174.

The Commonwealth initially sought to introduce twenty photographs of Trenton's deceased body into evidence and allow the jury to view the photographs during deliberations. Appellant filed a motion in limine seeking to exclude all photographs of Trenton's body from being viewed by the jury. The trial court granted the motion as to Exhibit 10, which depicted Trenton's open skull, and as to Exhibits 38 through 47, which showed medical equipment attached to Trenton. The trial court denied the motion as to Exhibits 1 through 9, finding that the photographs of Trenton's body exhibiting the injuries were "probative in establishing a pattern of repetitive abuse" and their "probative value outweigh[ed] any inflammatory effect." Id. at 186.

The defense made various attempts to discredit Forsythe's testimony. Specifically, on cross-examination, the defense questioned Forsythe's contention that Appellant would not allow her to leave the home between September 10 and September 13, indicating that Forsythe told police she had gone to the Family Dollar store on September 11. N.T. 3/10/14, jury trial, at 62. Forsythe responded, that while she did

visit the Family Dollar store, she could not recall when she went. Id. The defense also questioned Forsythe's contention that Appellant prevented her from using her phone, citing to the text message Forsythe sent Appellant on September 13, 2011, quoted supra. Forsythe explained that she sent the text while she was sitting next to Appellant. When questioned further, Forsythe clarified that while Appellant "watched when I called other people," she was able to send a "few" text messages from her phone. Id. at 63. The defense further elicited testimony from Forsythe that, in August of 2011, she slapped Trenton because he was asking too many questions about a movie. N.T. at 63-64.

The defense called only two witnesses, Appellant and Melissa Leadbeater ("Leadbeater"). Leadbeater testified that she saw Trenton at her husband's funeral with Forsythe on September 10, 2011, suggesting that Trenton was not home alone with Appellant while Forsythe attended the funeral as she had testified. N.T. 3/11/14, jury trial, at 187-89.

Appellant testified that, on September 10, he heard a bang come from Trenton's bedroom, and when he went to investigate, he noticed Trenton had some small scratches on his body. Appellant theorized that Trenton had fallen off a desk while he was trying to get one of his cats. Id. at 192. Appellant denied laying a hand on Trenton in the days leading up to his death, and he further testified that he did not see Trenton fall down the stairs on September 13, as he had been in bed all day and had no contact with Trenton until he took him to the hospital. Id. at 195. Moreover, Appellant testified he had not seen any of the bruises on Trenton's body until they cut his clothes off at the hospital. Id. at 200. While Appellant testified that he did not see Forsythe hit Trenton in the days preceding his death, he did witness her grab his shoulders and shake him. Id. at 201.

When questioned about his statement to Trooper Pierce that he struck Trenton in the head and slapped him across the face, Appellant denied making this statement, claiming instead that he was trying to explain what Forsythe had accused him of doing. Id. at 202. Appellant further testified that Trooper Pierce's report was "mistaken" in as much as it indicated that Appellant told the trooper he had seen Trenton fall down the stairs. Id. at 203.

After two days of testimony, the jury found Appellant guilty of first-degree murder and endangering the welfare of children. The trial then proceeded to the penalty phase, where the Commonwealth offered two aggravating factors for the jury to consider, namely, that the killing was by means of torture[7] and that Trenton was under the age of twelve.[8] The Commonwealth called Trooper Pierce to testify as to the date of Trenton's birth, as verified by his birth certificate, to establish that Trenton was, in fact, under the age of twelve. Trooper Pierce confirmed that Trenton's date of birth was February 17, 2007, making Trenton four years old at the time of his death. N.T. 3/12/14, sentencing phase, at 16-17. To support the contention of killing by means of torture, the Commonwealth asked the jury to consider the testimony of Drs. Schmidt and Larabee, which had been presented during the guilt phase.

Appellant testified during the penalty phase, and the defense called four additional witnesses: Appellant's grandmother, Appellant's counselor at the Fayette County Prison, Appellant's cousin, and Appellant's mother. The jury ultimately sentenced Appellant to death, unanimously finding, as the two aggravating factors, that the victim was under the

[7] 42 Pa.C.S. § 9711(d)(8).

[8] 42 Pa.C.S. § 9711(d)(16).

age of twelve and the offense was committed by means of torture. The jury found no mitigating circumstances. This timely direct appeal followed wherein Appellant raised the following issues:

> a) Whether the pretrial hearing court erred in failing to grant [Appellant's] Motion to Quash the charges of first[-]degree murder and third[-]degree murder[?]
>
> b) Whether the pretrial hearing court erred in failing to dismiss the aggravating factor of torture during the Omnibus Pre-Trial Motion Hearing[?]
>
> c) Whether the evidence was legally and factually insufficient to prove that the defendant committed the crime of criminal homicide beyond a reasonable doubt[?]
>
> d) Whether the trial court erred in failing to grant [Appellant's] Motion for Judgment of Acquittal at the conclusion of the Commonwealth's case, when the Commonwealth failed to sustain its burden of proving that [Appellant] had the specific intent to kill the deceased beyond a reasonable doubt[?]
>
> e) Whether the trial court committed reversible error in permitting nine (9) photographs of the body of the victim to be viewed by the jury during deliberations over defense counsel's objections that the photographs were highly prejudicial[?]
>
> f) Whether the trial court erred in permitting the aggravating factor of torture to be decided by the jury when there was no evidence of torture presented by the Commonwealth[?]

## II. SUFFICIENCY OF THE EVIDENCE

Appellant alleges that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he committed the crime of criminal homicide. Moreover, Appellant contends that the trial court erred in denying his Motion for Judgment of Acquittal, which he made at the end of the Commonwealth's case-in-chief, as the

Commonwealth failed to prove that Appellant had the specific intent to kill Trenton beyond a reasonable doubt.

When reviewing the sufficiency of the evidence, this Court is tasked with determining whether the evidence at trial, and all reasonable inferences derived therefrom, are sufficient to establish all elements of the offense beyond a reasonable doubt when viewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Powell, 598 Pa. 224, 238, 956 A.2d 406, 415 (2008) (citing, Commonwealth v. Bridges, 563 Pa. 1, 12, 757 A.2d 859, 864 (2000)).[9] Evidence is sufficient to sustain a conviction of first-degree murder where the Commonwealth establishes that: (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with malice and the specific intent to kill. Commonwealth v. Johnson, 615 Pa. 354, 369, 42 A.3d 1017, 1025 (2012) (citations omitted).

Appellant argues that, although it was not disputed that Trenton perished as a result of injuries caused by abuse, Appellant has consistently denied that he abused Trenton or caused his death. Appellant emphasizes that, while Dr. Schmidt determined Trenton died from "peritonitis due to closed abdominal injury due to battering," she also testified that the bruises on his body did not contribute to his death. N.T. 3/10/14, jury trial, at 96, 101. Moreover, Appellant stresses that Dr. Schmidt could not rule out that the injury to the abdomen was caused by a fall down the stairs, a fall off a jungle gym, or an

---

[9] It is the practice of this Court to perform a self-imposed duty to review the sufficiency of evidence underlying the first-degree murder convictions in all death penalty direct appeals, even in the absence of a sufficiency challenge. See Commonwealth v. Zettlemoyer, 500 Pa. 16, 26, 454 A.2d 937, 942 n.3 (1982) cert. denied, 461 U.S. 970, 103 S.Ct. 2444 (1983).

ATV accident. Id. at 101-02. Appellant further asserts that neither Dr. Schmidt nor Dr. Larabee could opine as to whether Trenton's alleged abuser was a man or woman.

Appellant also attacks the credibility of Forsythe by first highlighting the testimony of Melissa Leadbeater, who testified that Trenton was at her husband's funeral with Forsythe on September 10, 2011, thereby disputing Forysthe's claim that she had witnessed Appellant abusing Trenton when she returned home. Appellant next claims that, although Forsythe originally testified Appellant would not allow her to leave the home between September 10 and September 13, she later admitted she was at the Family Dollar Store on September 11, 2011.[10] Appellant further alleges Forsythe admitted that, the day after Trenton died, she told a Children and Youth Services caseworker she did not observe Appellant hit Trenton.[11] Finally, Appellant contends the only evidence presented at trial that linked him to Trenton's abuse came from Forsythe, and her testimony was not credible.

The Commonwealth responds by first suggesting Appellant's main argument that Forsythe was not credible is without merit, as "determinations of credibility are within the sole purview of the jury as finder of fact." Commonwealth's Brief at 4. The Commonwealth next dismisses Appellant's argument that the Commonwealth failed to establish that Appellant delivered the blows to Trenton's torso and abdomen which were the cause of the peritonitis. The Commonwealth compares the instant case to

---

[10] A review of the record reveals that, while Forsythe concedes that she told police she was at the Family Dollar Store, she could not recall the date. N.T. 3/10/14, jury trial, at 64.

[11] The record reflects that Forsythe testified that she did not recall making such a statement. Id. at 66.

Commonwealth v. Chambers, 602 Pa. 224, 980 A.2d 35 (2009) wherein the appellant repeatedly abused the victim and her siblings. The victim died after an exceptionally brutal episode of abuse during which appellant threw her into a radiator and then threw her between the bed and the wall, leaving her to suffocate to death. The medical examiner in Chambers concluded that the cause of death was due to a combination of factors, including the child's weakened state, blunt force trauma, and asphyxia. The appellant argued that because the medical examiner did not testify that his final blow to the three-year-old victim was sufficient to cause her death, the conviction could not stand. This Court rejected the so-called "final blow" argument and upheld appellant's conviction.

The Commonwealth contends that the evidence at trial clearly established strong circumstantial evidence that Appellant did, in fact, deliver the fatal blows which caused Trenton's peritonitis. Specifically, the Commonwealth explains that Appellant admitted to striking Trenton on the back and slapping his face, and "[t]he same finger shaped marks found on the head and chest, parts of the body [Appellant] admitted to striking, were found on the abdomen, torso, lower back, buttocks, indeed, the remainder of the victim's body." Commonwealth's Brief at 5.

Viewing the evidence in the light most favorable to the Commonwealth, the evidence sufficiently establishes each element of first-degree murder beyond a reasonable doubt. Thus we find the evidence was sufficient to support a finding of guilt on the first-degree murder charge.

First, the Commonwealth had the burden of establishing that Trenton's death was a homicide, which the Commonwealth aptly established through testimony of Dr. Larabee and Dr. Schmidt. Appellant stresses that Dr. Schmidt acknowledged that the bruises on

Trenton's body did not contribute to his death and she could not rule out that the injury to his abdomen was caused by a fall down the stairs, a fall off a jungle gym, or an ATV accident. As the Commonwealth indicated, however, this Court has consistently rejected the "final blow" argument in instances of child abuse. See, e.g. Powell, 598 Pa. at 241-42, 956 A.2d at 417 (where this Court found the verdict of first-degree murder was supported by the evidence of appellant's pattern of abuse despite the lack of evidence of a final blow which caused the child's death). Moreover, while Dr. Schmidt conceded she could not positively rule out the possibility that Trenton's injuries were caused by multiple falls, it was her opinion that Trenton's injuries were not consistent with a four-year-old child who had fallen. N.T. 3/10/14, jury trial, at 96, 101. Ultimately, Dr. Schmidt testified that Trenton died of "peritonitis due to closed abdominal injury due to battery," and declared within a reasonable degree of medical certainty that the manner of Trenton's death was homicide. Id. at 96-97. Similarly, Dr. Larabee determined that Trenton's cause of death was "intentional injury, non-accidental trauma, child abuse." N.T. 3/11/14, jury trial, at 173. Accordingly, the evidence supported the jury's conclusion that Trenton's death was a homicide.

Second, the Commonwealth had the burden of proving beyond a reasonable doubt that Appellant was responsible for killing Trenton, which the Commonwealth proved through the testimony of Dr. Schmidt, Dr. Larabee, Trooper Pierce, and Forsythe. As outlined supra, Dr. Schmidt and Dr. Larabee consistently testified that Trenton's injuries were consistent with battery. Appellant suggests that the Commonwealth failed to prove that he was Trenton's abuser, as neither Dr. Schmidt nor Larabee could determine whether the injuries were caused by a man or a woman. Appellant ignores,

however, that our standard of review tasks us with viewing all of the evidence in the light most favorable to the Commonwealth as verdict winner. The Commonwealth elicited testimony from Trooper Pierce and Forsythe that sufficiently proved that Appellant abused the child. Specifically, Trooper Pierce testified that Appellant confessed to striking Trenton, and Forsythe testified that she witnessed Appellant physically abusing Trenton three days prior to his death. N.T. 3/10/14, jury trial, at 44, 141-42. Appellant contends that Forsythe's testimony was not credible; however, the jury was free to find this evidence to be credible. See Commonwealth v. Hornberger, 441 Pa. 57, 61, 270 A.2d 195, 197 (1970) ("It is well settled that a jury or a trial court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness.") (citation omitted). Thus, viewing all of the evidence in the light most favorable to the Commonwealth, the jury could properly conclude that Appellant was responsible for Trenton's death.

Finally, the Commonwealth had the burden to prove that Appellant acted with the requisite malice and specific intent to kill. For first-degree murder, an intentional killing is a "[k]illing by means of poison, or lying in wait, or any other willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth may prove specific intent through purely circumstantial evidence. Johnson, 615 Pa. at 369, 42 A.3d at 1025 (citation omitted). "Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another." Commonwealth v. Hawkins, 549 Pa. 352, 368-69, 701 A.2d 492, 500 (1997) (citing Commonwealth v. Meredith, 490 Pa. 303, 311, 416 A.2d 481, 485 (1980)).

Here, Appellant's repeated attacks on four-year-old Trenton during which he inflicted blows to vital parts of Trenton's body, such as his head and stomach, over a period of at least three days, and his refusal to allow Trenton to receive timely medical attention while the child endured lasting effects of Appellant's abuse, proved beyond a reasonable doubt that Appellant acted with malice and specific intent to kill. See Johnson, 615 Pa. at 370, 42 A.3d at 1026 (finding the Commonwealth sufficiently proved specific intent where the appellant repeatedly abused a two-year-old child for a period of 45-60 minutes, inflicting 150 bruises and injuries and causing internal injuries which lead to the victim's death.); Powell, 598 Pa. at 241, 956 A.2d at 416-17 (stating "[t]he extensive physical injuries [the] appellant inflicted on the child, his cold-hearted failure to timely seek medical assistance, and the contradictory explanations [the] appellant offered as to how [the child] sustained his injuries . . . were sufficient to support the inference that [the] appellant intentionally caused the child's death.").

Appellant further asks this Court to reverse his judgment and grant him a new trial on the basis the trial court erred in denying Appellant's Motion for Judgment of Acquittal at the conclusion of the Commonwealth's case-in-chief since the Commonwealth failed to prove that Appellant acted with specific intent to kill Trenton. As outlined supra, we find that the Commonwealth proved beyond a reasonable doubt that Appellant acted with the requisite malice and specific intent to kill.

Appellant also contends that the pretrial hearing court erred in failing to quash charges of first-degree murder and third-degree murder, as the evidence offered was insufficient to prove that Appellant caused any of Trenton's injuries. As the Commonwealth indicates, however, because a jury determined that Appellant

committed first-degree murder beyond a reasonable doubt, this contention is moot. See Commonwealth v. McCullough, 501 Pa. 423, 427, 461 A.2d 1229, 1231 (1983) (stating "[t]his fact is clearly immaterial where at the trial the Commonwealth met its burden by proving the underlying felony beyond a reasonable doubt."); Commonwealth v. Lee, 541 Pa. 260, 270, 662 A.2d 645, 650 (1995) ("[Defendant's] adjudication of guilt renders moot any allegation that the Commonwealth failed to establish a prima facie case with respect to the homicide [at the preliminary hearing] . . .).

## III. ADMISSION OF PHOTOGRAPHS

Appellant next posits the trial court erred in permitting nine photographs of Trenton's body to be viewed by the jury during deliberation over defense counsel's objections that the photographs were highly prejudicial. Specifically, Appellant argues the photographs inflamed the minds and passions of the jury and were cumulative evidence to the testimony of Drs. Schmidt and Larabee. Appellant alleges that "the jury was unable to look past the images of the child on a medical table when the evidence was legally and factually insufficient to prove [Appellant's] guilt beyond a reasonable doubt." Appellant's Brief at 18.

The Commonwealth responds that the photographs were properly admitted, as they "exhibited the injuries and bruising that were testified to as the manner and cause of death." Commonwealth's Brief at 7. Moreover, the Commonwealth argues that, in this particular case, the jury needed to view the injuries inflicted on Trenton to determine whether Appellant committed the beatings with the requisite mens rea.

The Commonwealth sought to introduce twenty photographs to the jury, and Appellant filed a motion in limine seeking to keep the photographs from being viewed by

the jury. The trial court ultimately granted the motion with respect to one photograph which showed Trenton's exposed skull, as well as ten photographs, which depicted medical devices attached to Trenton's body. The trial court found the remaining photographs to be inflammatory, but possessing evidentiary value sufficient to warrant their admission.

At trial, defense counsel categorized his motion in limine as an objection to the photographs being displayed to the jury, not an objection to their admission to the record. N.T. 3/11/14, jury trial, at 183. Accordingly, the trial court's Opinion in Support of Jury Verdict did not discuss the admissibility of the photographs, but rather the trial court analyzed whether the photographs were properly displayed to the jury. In so doing, the trial court determined that the photographs were "necessary to show the amount of deadly force[ ] the Appellant used on vital parts of Trenton's body to enable the jury to infer an intent to kill." Trial Court Opinion, dated June 5, 2014, at 14.

While Appellant consistently maintains that he does not challenge the admissibility of the photographs, his motion in limine and appellate brief analyze the test used to determine the admissibility of photographs. For the sake of clarity, we will discuss both the admissibility of the photographs and the decision to allow the jury to view the photographs during deliberation.

"Photographs of a murder victim are not per se inadmissible." Commonwealth v. Cox, 546 Pa. 515, 534, 686 A.2d 1279, 1288 (1996) (citing Lee, 541 Pa. at 278, 662 A.2d at 654). In reviewing a challenge to the trial court's admission of photographs, we employ the abuse of discretion standard. Commonwealth v. Pruitt, 597 Pa. 307, 327,

951 A.2d 307, 319 (2008) (citation omitted). A trial court must engage in the following two-step analysis when considering the admissibility of photographs of homicide victims:

> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

Commonwealth v. Tharp, 574 Pa. 202, 222, 830 A.2d 519, 531 (2003) (citation omitted).

Accepting the trial court's finding that the photographs are inflammatory and after having viewed the photographs, we find that the evidentiary value of the photographs outweighed the likelihood of inflaming the passions of the jurors. Appellant maintains that the photographs were cumulative evidence to the testimony of Drs. Schmidt and Larabee and "inflamed the jury to the point where they could not possibly review the evidence presented in the trial in a fair and impartial manner." Appellant's Brief at 18. This Court consistently has held, however, that "the fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant." Commonwealth v. Karenbauer, 552 Pa. 420, 443, 715 A.2d 1086, 1097 (1998) (citation omitted); See Johnson, 615 Pa. at 384, 42 A.3d at 1034 ("Even if the nurse and the pathologist could have testified as to these injuries, a witness's ability to testify as to the condition of the body does not render photographs per se inadmissible.").

Most recently, in Commonwealth v. Woodard, __Pa. __, __A.3d __, 2015 WL 7767271 (Dec. 3, 2015), this Court found that the trial court did not err in admitting into evidence twelve color photographs depicting a two-year-old child's external injuries and one black and white photograph portraying the child's lacerated liver. The appellant in

Woodard was convicted of first-degree murder and sentenced to death as a result of the heinous beating he administered on the two-year child who was left in his care. The appellant claimed that he only hit the child once, and the cause of death was an accidental drowning after he sent the child upstairs to take a bath. In finding that the trial court properly admitted the photographs of the child, this Court concluded that the images were necessary to illustrate the "nature and extent of [the child's] injuries" and the photographs "related directly to the requisite elements of first[-] degree murder … and that [a]ppellant possessed the specific intent to kill." Woodard at__, __A.3d at __, 2015 WL 7767271, at *10.[12]

Similarly, a crucial portion of Appellant's defense at trial was that Trenton was a clumsy child and many of his bruises were caused by accidental falls. The photographs, while troubling to view, were admissible to explain the nature and extent of Trenton's injuries. The photographs depict the severity of Appellant's attacks on Trenton's four-year-old body and tend to prove that Appellant beat Trenton with the necessary mens rea. See Karenbauer, 552 Pa. at 442, 715 A.2d at 1096 ("It is well established,

---

[12] In his dissenting opinion, Chief Justice Saylor suggests that the instant case and Woodard may cause "confusion in the area of the law in terms of what this Court means by the word 'inflammatory[,]'" as the Woodard majority credited the trial court's finding that the photographs discussed supra were not inflammatory, while we instantly credit the trial court's conclusion that the photographs of Trenton were inflammatory. Dissenting Opinion, slip op. at 2 (Saylor, CJ). We respectfully disagree. As noted supra, the standard of review for the admission of photographs is an abuse of discretion standard. Accordingly, absent a finding that the trial court misapplied the law or the judgment rendered was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, a trial court's evidentiary ruling will stand. Commonwealth v. Davido, __ Pa. __, 106 A.3d 611, 645 (2014).

and of particular importance to our analysis, that photographs of the victim's wounds may be relevant to show the assailant's intent to kill.") (citation omitted).

Having found the photographs were properly admitted, we turn now to Appellant's claim that the trial court erred in allowing the photographs to be viewed by the jury. Pennsylvania Rule of Criminal Procedure 646 states, in pertinent part, "Upon retiring, the jury may take with it such exhibits as the trial judge deems proper . . . ." Pa.R.Crim.P. 646(A). This Court has interpreted this Rule as committing the determination of what objects may be viewed by the jury during deliberations to the sound discretion of the trial court, and we will not reverse that determination absent an abuse of discretion. Commonwealth v. Rucci, 543 Pa. 261, 285, 670 A.2d 1129, 1141 (1996). An abuse of discretion "is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence of record, discretion is abused." Id. (quoting Melzer v. Witsberger, 505 Pa. 462, 475, 480 A.2d 991, 997 (1984)).

Here, the trial court found the probative value of the photographs clearly outweighed any potential for prejudice, as the photographs were necessary to demonstrate the amount of deadly force that Appellant used on Trenton. Appellant does not suggest that the trial court's decision was the result of partiality, prejudice, bias, or ill will; but rather, he argues the photographs inflamed the passions of the jury. Having viewed the photographs, we find no abuse of discretion in the trial court's decision to allow the jury to view these nine photographs. Accordingly, this issue affords Appellant no relief.

## IV.    AGGRAVATING CIRCUMSTANCE OF TORTURE

Appellant next contends the trial court erred in permitting the aggravating factor of torture, 42 Pa.C.S. § 9711(d)(8), to be decided by the jury, as the Commonwealth did not present any evidence that Appellant assaulted Trenton in any manner, let alone tortured him.   Appellant further argues that Drs. Schmidt and Larabee could not opine how long the acts of abuse took place, and emphasizes that there was no evidence that a weapon was used.

The Commonwealth suggests that in an abuse case which culminates in the beating death of the victim, the entire course of the conduct can establish the aggravating circumstance of torture.   The Commonwealth highlights the testimony of Drs. Larabee and Schmidt that the bruises covering a substantial portion of Trenton's body were of different ages, suggesting that Trenton sustained abuse over a period of time. Moreover, the Commonwealth indicates that the abuse was severe enough to cause internal injuries.   Finally, the Commonwealth stresses that Trenton would have been experiencing painful symptoms, including severe abdominal pain, fever, lethargy, nausea, vomiting, and increased urine output in the days leading to his death.

The trial court found that Trenton's injuries were "painful, sustained over a period of time, and all were inflicted prior to death."   Trial Court Opinion, dated June 5, 2014 at 17.   Moreover, the trial court reasoned if Appellant simply had wanted to kill Trenton, he easily could have done so, but instead he chose to beat the child to death over a period of time; therefore, the evidence amply supported the jury's finding of torture.   Id.

In order to establish the aggravating circumstance of torture, "the Commonwealth must prove beyond a reasonable doubt that the defendant intentionally inflicted on the

victim a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." Karenbauer, 552 Pa. at 447, 715 A.2d at 1099 (citing Commonwealth v. Whitney, 550 Pa. 618, 637, 708 A.2d 471, 480 (1998)). "The linchpin of the torture analysis is the requirement of an intent to cause pain and suffering in addition to the intent to kill." Commonwealth v. Ockenhouse, 562 Pa. 481, 493, 756 A.2d 1130, 1136 (2000) (citing Commonwealth v. Edmiston, 535 Pa. 210, 236, 634 A.2d 1078, 1091 (1993)). In other words, the Commonwealth must prove the defendant was not satisfied with the killing alone. Id. (citing Commonwealth v. Caldwell, 516 Pa. 441, 448, 532 A.2d 813, 817 (1987)). It is not enough for the Commonwealth to prove, however, that the victim endured pain before dying. Commonwealth v. Brode, 523 Pa. 20, 28, 564 A.2d 1254, 1258 (1989).

This Court has enumerated a number of factors to guide our determination as to whether a murder was committed by means of torture. These factors include, but are not limited to: "(1) the manner in which the murder is committed, including the number and types of wounds inflicted; (2) whether the wounds were inflicted in a vital or non-vital area of the body; (3) whether the victim was conscious during the episode and (4) the duration of the episode." Ockenhouse, 562 Pa. at 493-94, 756 A.2d at 1137.

This Court previously has considered the applicability of the torture aggravator in the context of a murder of a child by a caretaker. For example, in Powell, we determined that the finding of torture was warranted where the child's multiple injuries, administered at the hands of his father, including blows to vital and non-vital parts of the child's body, were distinct from the traumatic brain injury that led to his death. Moreover, the evidence in Powell established that the child's injuries were "painful, sustained over a long period of

time, and the vast majority, if not all, were inflicted prior to death." Powell, 598 Pa. at 257, 956 A.2d at 426. Similarly, in Karenbauer, this Court held the finding of the torture aggravator to be appropriate, explaining that had the defendant:

> intended to simply kill the victim, he could have used his prohibitive size advantage and the knife in his possession to do so far more expeditiously than he actually did. Instead, he elected to cause eighteen separate wounds … not deep enough to cause fatal injury, but certainly deep enough to cause pain to the victim, who remained conscious throughout her ordeal.

Karenbauer, 552 Pa. at 448, 715 A.2d at 1099.

Most recently, in Woodard, this Court concluded that there was sufficient evidence for a jury to conclude that the appellant tortured the child. Specifically, this Court found "the sheer number of injuries inflicted upon nearly every surface of [the child's] body both fatal and nonfatal, over the course of hours, would cause unimaginable pain to the young child who had been placed in [a]ppellant's exclusive care." Woodard at __, __ A.3d at __, 2015 WL 7767271, at *19.

The record establishes that herein the Commonwealth proved beyond a reasonable doubt that the killing was accompanied by the circumstance of torture. Appellant argues that neither Dr. Schmidt nor Dr. Larabee gave an opinion as to how long the abuse occurred. Both doctors testified, however, that Trenton's bruises appeared to be of different ages, "with some appearing to be not more than two to three days old, and others not less than six to twelve hours old," indicating that Trenton had endured abuse over a period of time. N.T. 3/11/14, jury trial, at 173. Moreover, Forsythe testified that in the weeks leading up to Trenton's death, she began noticing unusual bruising on his body. Forsythe further testified that following the incident of abuse she discovered on

September 10, Trenton began complaining of a stomach ache. Dr. Schmidt confirmed that in addition to severe abdominal pain, Trenton would have been experiencing lethargy, a fever, nausea, and vomiting. Forsythe also stated that Appellant refused to allow her to seek medical attention for Trenton until he became unresponsive approximately three days after the attack. Dr. Larabee verified that if Trenton had presented at the hospital earlier, he "likely would have survived," as peritonitis is treatable in its early stages. Id. Moreover if Appellant wished to simply kill Trenton, a four-year-old child, he easily could have done so. Instead, like the victim in Powell, Trenton sustained injuries to vital and non-vital parts of the body that were distinct from the blow to his abdomen which caused the peritonitis, indicating that Appellant sought to cause Trenton additional pain and suffering. See Ockenhouse, 562 Pa. at 495, 756 A.2d at 1138 (bruises on non-vital parts of the body may indicate "an intent to cause pain and suffering in addition to the intent to kill."). Accordingly, we find that the Commonwealth proved the aggravating circumstance of torture beyond a reasonable doubt.[13]

Finally, Appellant argues that the pretrial hearing court erred in failing to dismiss the aggravating circumstance of torture and failing to bar the Commonwealth from seeking the death penalty, as the Commonwealth failed to present evidence that

---

[13] Section 9711(c)(1)(iv) of our Death Penalty Statute "provides that if the jury finds at least one aggravating circumstance and no mitigating circumstances, then the verdict must be death. Thus, so long as one aggravator was sustainable, if there were no mitigators, the statute requires the death sentence must be upheld." Powell, 598 Pa. at 257, 956 A.2d at 426 (internal quotations and citations omitted). Accordingly, if we were to find that the Commonwealth did not establish the aggravating circumstance of torture beyond a reasonable doubt, Appellant would not be entitled to a new penalty phase, as the jury found two aggravating circumstances to apply and no mitigating factors, and Appellant does not dispute that Trenton was under the age of twelve years old at the time of the murder. See 42 Pa.C.S. § 9711(d)(16).

Appellant tortured Trenton. As the Commonwealth indicates, however, the jury found the Commonwealth presented sufficient evidence to prove torture as an aggravator, and therefore this claim is moot. See Commonwealth v. Walter, 600 Pa. 392, 401, 966 A.2d 560, 565 (2009) ("Any claims of inadequacy [the a]ppellant alleges with respect to pre-trial matters have been rendered moot by the subsequent independent judicial judgment confirming the existence of the aggravating circumstance in this case.") (internal quotations and citations omitted).

## V. STATUTORY REVIEW

Having concluded that Appellant's claims are without merit, we are required to affirm the judgment of sentence unless we determine that "(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." 42 Pa.C.S. § 9711(h)(3)(i)-(ii).

Instantly, the jury found two aggravating circumstances: the offense was committed by means of torture (42 Pa.C.S. § 9711(d)(8)), and the victim was a child under the age of 12 (42 Pa.C.S. § (d)(16)). At trial, Trooper Pierce testified to the date of Trenton's birth, as verified by his birth certificate, to establish that Trenton was, in fact, under the age of twelve. Trooper Pierce confirmed that Trenton's date of birth was February 17, 2007, making Trenton four years old at the time of his death. Moreover, as discussed at length supra, the Commonwealth proved the aggravating circumstance of torture beyond a reasonable doubt.

After careful review of the record, we find Appellant's death sentence was not the product of passion, prejudice, or any other arbitrary factor.

## VI. CONCLUSION

For the foregoing reasons, Appellant's judgment of sentence is affirmed.[14]

Mr. Justice Eakin did not participate in the decision of this case.

Mr. Justice Baer and Madame Justice Todd join the opinion.

Mr. Chief Justice Saylor files a dissenting opinion.

---

[14] The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence, and the opinion and order of our Court in accordance with 42 Pa.C.S. § 9711(i).