J-S04009-16
J-S04010-16
J-S04011-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| DAVID STAHL, | |
| Appellee | No. 1937 WDA 2014 |

Appeal from the Order Entered October 20, 2014
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0001233-2012

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| DAVID FRANK STAHL, | |
| | No. 1938 WDA 2014 |

Appeal from the Order October 20, 2014
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0001233-2012

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| DAVID FRANK STAHL, | |
| Appellant | No. 1 WDA 2015 |

Appeal from the Judgment of Sentence June 27, 2014
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0001233-2012

BEFORE:  BOWES, OLSON, and STRASSBURGER,[*] JJ.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 29, 2016**

David Stahl appeals at docket number 1 WDA 2015 from the June 27, 2014 judgment of sentence of life imprisonment that the trial court imposed after a jury convicted him of first-degree murder.  The Commonwealth and Appellant also filed appeals, which were docketed at 1937 WDA 2014 and 1938 WDA 2014, from an October 20, 2014 order awarding some, but not all, of the restitution sought by the Commonwealth in this case.  This panel consolidated the appeals for disposition.  We affirm.

On June 27, 2014, a jury convicted Appellant of first-degree murder in connection with the February 18, 2012 strangulation death of his wife Rebecca Stahl.  Appellant and Rebecca lived on 803 Seton View Drive, Greensburg.  Rebecca's close friend Debra Lynn Morrison testified that the victim and Appellant had financial issues and Rebecca had told Ms. Morrison many times that she was afraid of Appellant.  N.T. Trial, 6/23-27/14, at 66. Other evidence indicated that Rebecca and Appellant had a stormy relationship.

_____

[*] Retired Senior Judge assigned to the Superior Court.

In January 2012, the decedent had a hysterectomy and part of her bowel removed. Rebecca was still very weak from that operation the last time that Ms. Morrison saw the victim alive, Friday, February 17, 2012, when they lunched together. On Saturday, February 18, 2012, Rebecca had plans to watch a movie with her sister Kelly Beltz that evening. Rebecca called at noon, telling Ms. Beltz that she needed to speak with Appellant before she could meet Ms. Beltz and had to wait for him to return from work. Ms. Betlz explained that Appellant was controlling and that Rebecca did not go anywhere or do anything without Appellant's knowledge. Rebecca neither called to cancel plans nor arrived to watch the movie. After Ms. Beltz "didn't hear from her all day Sunday or Monday," she telephoned Appellant on Tuesday morning, February 21, 2012, and asked him where she was. *Id*. at 74. Appellant responded, "[A]ll he knows is [Rebecca] went to see a college friend named Jodie, that's all he knows." *Id*. at 74.

The morning of February 21, 2012, Rebecca's father Kenneth Anderson went to the state police barracks and reported her missing. Pennsylvania State Trooper Michael W. Laird spoke with him. Mr. Anderson said that the family had last heard from the victim on February 18, 2012, and that was highly unusual for her not to be in contact with them for three days. Mr. Anderson was also concerned since "she had just previously within the last few weeks had a major surgery consisting of a hysterectomy and part of her

- 3 -

bowel being removed." *Id*. at 72. At 12:30 p.m. on February 21, 2012, Trooper Laird went to 803 Seton View Drive to speak with Appellant, who reported that he last saw the victim the previous day and that they had texted each other. *Id*. at 76. Appellant claimed that he had deleted the texts.

Trooper Laird went to his car and telephoned Ms. Beltz, who informed him about Appellant's controlling behavior. Ms. Beltz also said that Appellant and Rebecca argued when he drank. The trooper immediately returned and spoke with Appellant again. Appellant then admitted that he went to a bar on Saturday, February 18, 2012, and that, afterwards, he argued with his wife. Appellant maintained that after that squabble, he left to go to another bar and returned home at around midnight, and Rebecca was asleep. Appellant told Trooper Laird that on Sunday February 19, 2012, he and Rebecca went for a drive together during the afternoon.

With Appellant's consent, Trooper Laird looked around the Seton View Drive residence for Rebecca. The trooper returned to the barracks, and, after speaking with his supervisor, listed Rebecca as missing and, due to her recent surgery, endangered. State Trooper Thomas Kaecher was assigned to investigate the disappearance. He and State Trooper Robert Burford went to Appellant's house at 8:00 p.m. on Tuesday, February 21, 2012, and asked Appellant for a follow-up interview about Rebecca's whereabouts.

Appellant proffered the following details about the events of Saturday February 18th through Tuesday February 21st. On February 18, 2012 he took his daughter by his former wife to volleyball practice at about 9:00 a.m. and returned home. He and Rebecca argued about her damaged car which needed an estimate for repairs. Between 10:30 and 11:00 a.m., Appellant left, did some chores, and then went to two different bars. Appellant arrived back at home at 5:00 p.m., when he again argued with Rebecca, this time about his drinking. At around 6:30 p.m., Appellant left the residence to go to the Whitney Club, a bar about twenty minutes from his home. He stayed there, ignoring texts and calls from Rebecca, until 12:30 a.m. on Sunday February 19th, when he came home again. Rebecca was asleep.

Appellant continued his narrative to Troopers Kaecher and Burford as follows. On Sunday morning between 7:30 and 8:00 a.m., while Rebecca was still sleeping, Appellant went and delivered materials to a job site. Appellant was not able to give a job name or address. Appellant returned to his residence around 2:00 p.m., when he and Rebecca went for a drive until 5:00 p.m. They then watched television and went to bed. The following morning, Monday, February 20, 2012, Appellant went to a local Lowes to purchase a bathroom door and drywall "because he said Rebecca wanted a smooth celling as opposed to a textured ceiling" in the stairwell leading to the basement. *Id*. at 97. Appellant purchased the door since the existing

one "had a hole in it from a towel holder[.]" *Id*. Appellant then replaced the bathroom door, and placed the old one on the curb for garbage pickup. When Appellant left home again on Monday, February 20, 2012 at 11:30 a.m. to go to work, Rebecca was still there.

During that February 21, 2012 interview, Appellant relayed to police that the following then occurred. When he returned home after work on February 20, 2012, Rebecca was not at home. Appellant was not concerned since he "had overheard a conversation – a phone conversation Rebecca had with a friend named Jodie on Thursday before the weekend and he heard her mention about getting together with Jodie on Monday so he figured that's where she was." *Id*. at 101. Appellant was unable to supply any further information about Jodie, including a last name, address, or telephone number. Appellant decided to go to a bar and returned home at 8:00 p.m. Monday evening. When Appellant awoke on Tuesday February 21st, Rebecca still had not come back home. Appellant asserted that he called Rebecca's mother Tuesday morning but "her mother said not to call the police." *Id*. at 103.

Trooper Kaecher took notes of the foregoing statement, and Appellant executed the notes. That trooper noticed that medicine belonging to the victim was in her home and that Appellant had scratches on his nose and cheek and abrasions on the back of his hands. Appellant said that the dog

jumped on him and that his hands were injured when he was fixing his car. With consent, Trooper Kaecher examined the home, and it appeared as though all Rebecca's personal hygiene items and clothes were present. Appellant, who appeared unconcerned about his wife's absence, told the officer that she had not packed anything.

State Trooper Brian Kendgia, pursuant to a written consent-to-search, went through Appellant's home at 10:00 a.m. on Wednesday February 22, 2012. He observed that there was one wall with new drywall in the downstairs game room and a drywall patch on the ceiling to the stairs leading to that area. The bathroom door was new.

Police conducted an investigation to verify the information in Appellant's February 21, 2012 statement. They returned to Appellant's residence at 8:00 p.m. on February 22, 2012, and administered ***Miranda*** warnings to him. After waiving those rights, Appellant conducted a tape-recorded interview, which was transcribed and introduced as an exhibit. Police challenged Appellant's report that he left the bathroom door for garbage collection outside his residence on Monday, February 21, 2012, since they were told that there was no door or bag containing enough wood to be a door. Police informed Appellant that the man "who remembers picking your garbage up . . . doesn't recall any door that he had picked up. He recalls picking up uh a few pieces of wood and uh a couple pieces of

drywall." Commonwealth Exhibit a 10 at (unnumbered page) 2. Appellant retracted his early statement concerning the door and told police that he chopped up the door and used part of it as kindling.

Police next confirmed that Appellant previously reported that he went for a drive with Rebecca from approximately 2:00 to 5:00 p.m. on Sunday, February 19, 2012. After Appellant agreed that this was true, police said that they had spoken with a bartender, Robert Leham, who told them that Appellant had a beer at 3:00 p.m. on February 19, 2012, at the bar where Mr. Leham worked. Mr. Leham stated that Appellant was alone. Appellant responded that Rebecca remained in the car while he drank the beer.

Police had obtained Rebecca's telephone records and, contrary to Appellant's previous indication that he stopped sending texts to Rebecca on Saturday afternoon, her telephone records established that Appellant continually texted her until 7:00 p.m. that evening. Appellant then stopped the interview.

After being questioned by police at 8:00 p.m. on February 22, 2012, Appellant went to a local bar and told two women that his wife had left him. He gave one of them his wedding ring.

In the meantime, Trooper Burford obtained a search warrant for 803 Seton View Drive. In the basement freezer, police found garbage bags containing some of Rebecca's clothing and personal items, including a

- 8 -

partially burnt driver's license, as well as a man's boots, socks, t-shirt, and blue jeans. The boots had dirt and bits of arborvitaes, which are bushes cultivated for landscaping, on them. Rebecca's and Appellant's cars were both in the garage. Using luminol, a substance that renders blood particles fluorescent, police discovered bloodstains in the following areas in the house: 1) a small bloodstain on the bottom of the basement steps; 2) four one-foot stains on the tiled basement hall floor; and 3) two stains on the wall of the stairwell leading to the basement. Police then applied leuco crystal violet, which is another test that reveals the presence of blood, in the bathroom. There was blood on the tile floor of the bathroom and at various places on the carpet outside the bathroom.

Police also saw that one basement wall had been replaced with new, unpainted dry wall. In the basement, they also observed a wooden picture that appeared to have blood on it and that some of the baseboard trim was missing. The piece of removed trim with what appeared to be bloodstains was discovered in another area of the house.

On February 24, 2012, police obtained permission to examine a location with many arborvitae bushes on Bell Memorial Church Road in Unity Township. At 10:15 a.m., they discovered Rebecca's body wrapped in clear plastic and blue U-Haul moving blankets under the bushes. The body had cuts and bruises. Appellant was arrested. On February 29, 2012, while in

the local county jail, Appellant asked to speak to police. He was again advised of and waived his *Miranda* rights. At that time, Appellant told police that he killed Rebecca on Saturday, February 18, 2012, in self-defense, after she tried to stab him with a knife. He reported that he panicked and hid her body in the bushes and threw away her purse and cell phone.

Dr. Cyril H. Wecht, a forensic pathologist, was utilized to introduce autopsy photographs of the victim into evidence, and he explained what the autopsy demonstrated. Rebecca had sustained numerous external injuries, including a laceration on her scalp, bruises on her mouth and chest, and ligature marks consistent with strangulation on her neck. Dr. Wecht opined that the mouth injuries were caused by a punch and that bruises on the victim's head and chest were inflicted by either a blow or when she fell into an object.

Using the autopsy pictures, Dr. Wecht explained the nature of Rebecca's internal injuries, as follows. There was hemorrhage under the surface of her scalp on the left side of the skull. Dr. Wecht showed the jury this subscapular hemorrhage, which supported his opinion that her head was struck by either a blow or an object. The internal organs revealed numerous areas of hemorrhage in soft tissues and muscles of the neck, around the larynx and entrance to the esophagus, under the sternum, and in tissue

under the breast plate. By referencing pictures of bleeding in Rebecca's internal organs, Dr. Wecht supported his conclusion that she had either suffered a severe punch to the chest area or fallen violently against something. Rebecca had a fracture of a bone in the neck. Based upon the amount of force applied to the neck, as evidenced by the external and internal injuries shown in the pictures, Dr. Wecht opined that, the victim died of "asphyxiation due to manual strangulation." *Id*. at 347. He characterized the force applied to Rebecca's neck as extreme.

Ashlee Mangan was qualified as an expert in serology, which pertains to the examination of biological fluids including blood. She obtained a blood sample and fingernail clippings from Rebecca. In addition, police gave her: 1) vaginal, oral and anal swabs from Rebecca; 2) fibers from the basement stairwell carpet; 3) the items of male clothing found in Appellant's basement freezer; 4) a men's hoodie found in the house; 5) the section of wood trim; 6) the painting retrieved from the downstairs game room; and 7) a blood sample from Appellant. The two blood samples were subjected to DNA analysis.

Ms. Mangan reported that the swabs were negative for the presence of semen and blood so she concluded that the victim had not been raped. The male hoodie had blood on the left pocket, sleeve, and cuff, and the blue jeans had blood in different areas on both legs. There was also blood on the

wood trim, wooden frame of the picture, carpet fibers, socks, and on the fingernail clippings.

Alex Glessner was qualified as an expert in conducting DNA analysis and performed analyses of the victim's blood, Appellant's blood, and the bloodstained items described by Ms. Mangan. Mr. Glessner concluded that the blood on the carpet fibers, the wooden trim, and the wooden frame belonged to Appellant, that Rebecca's fingernails and the sock had a combination of both her and Appellant's blood, and that the bloodstains on the male hoodie and jeans were from Rebecca.

Based upon this proof, the jury convicted Appellant of first-degree murder on June 27, 2014, and he was sentenced immediately to life imprisonment, costs, and an indeterminate amount of restitution. The Commonwealth filed a timely motion to modify the sentence of restitution, and Appellant countered with a timely post-sentence motion. After conducting hearings, on October 20, 2014, the trial court ordered Appellant to pay restitution in the amount of $14,116.55, which represented Rebecca's funeral costs, but it denied the Commonwealth's request to impose over $60,000 in restitution for various expenses purportedly associated with the administration of Rebecca's estate.

Both the Commonwealth and Appellant appealed from the October 20, 2014 restitution award, and, after his post-sentence motion was denied,

Appellant filed a direct appeal from the judgment of sentence of life imprisonment. In order to determine if Appellant is entitled to a new trial, thereby nullifying the restitution award, we first address the issues presented in Appellant's direct appeal:

> I. Whether the trial court erred when it allowed the Commonwealth to introduce thirty-four photographs depicting the victim's injuries, including photographs of the victim's organs which were taken during the autopsy.

> II. Whether the trial court erred when it instructed the jury as to a time frame regarding the element of intent.

Appellant's brief at 1 WDA 2005, at 4.

Appellant's first position is that the trial court erroneously admitted into evidence color autopsy photographs depicting the victim's brain, neck and tongue, exposed gums, and interior chest wall. Appellant's brief at 9. Initially, we outline our standard of review:

> Photographs of a murder victim are not *per se* inadmissible. In reviewing a challenge to the trial court's admission of photographs, we employ the abuse of discretion standard. A trial court must engage in the following two-step analysis when considering the admissibility of photographs of homicide victims:

> First, a trial court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Haney*, 131 A.3d 24, 37 (Pa. 2015) (citations omitted).

In **Haney**, a new trial was not granted even though nine color photographs of a child's body were introduced into evidence. The photographs were determined to be relevant because they depicted the injuries sustained by the victim to prove that the defendant, who was convicted of first-degree murder and sentenced to death, beat his victim with the requisite *mens rea*, specific intent. Noting that autopsy pictures are often relevant to the issue of specific intent, our Supreme Court found that the evidentiary value of the pictures outweighed the likelihood of inflaming the passions of the jurors.

Similarly, in **Commonwealth v. Woodard**, 129 A.3d 480 (Pa. 2015), our High Court concluded that the trial court in a murder case did not abuse its discretion in permitting into evidence twelve photographs, which included a depiction of the victim's liver, of a two-year-old's injuries. Once again, it was ruled that the images were pertinent to establish the nature and extent of the injuries sustained by the victim and constituted direct proof of the defendant's specific intent to kill.

In **Commonwealth v. Watkins**, 108 A.3d 692, 707 (Pa. 2014), the Court also visited, in the PCRA context, the issue of whether autopsy photographs admitted into evidence required the grant of a new trial. It held that direct-appeal counsel was not ineffective for failing to litigate that

- 14 -

the pictures were improperly admitted into evidence, despite the fact that they were shocking as they showed a nine-year-old boy and eighteen-week-old female infant. The **Watkins** Court stated that, even though "photographs of a homicide victim can be unpleasant, disturbing, and brutal," it is unnecessary "to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt." **Id**. at 708 (citation omitted). These three cases are just the latest in a long line of decisions wherein our Supreme Court has refused to grant a new trial after a first-degree murder conviction based upon the admission of graphic photographs of a victim's body. **See e.g., Commonwealth v. Pruitt**, 951 A.2d 307 (Pa. 2008); **Commonwealth v. Tharp**, 830 A.2d 519 (Pa. 2003).

In the present case, before trial, Appellant objected to the introduction of nineteen autopsy photographs. The trial court refused to allow four of those pictures to be shown to the jury but concluded that, "The remaining photographs clearly demonstrated essential evidentiary value, clearly outweighing any potential for prejudice." Trial Court Opinion, 2/19/15, at 10. Additionally, the trial court cautioned the jurors about the photographs, advising them "not to let your emotions be inflamed by seeing these. They

are being admitted for a purpose and that is so when Dr. Cyril Wecht testifies he can tell you about his autopsy[.]" N.T. Trial, 6/23-27/14, at 291.

Dr. Wecht carefully linked each picture to an explanation of the injuries suffered by the victim and reported how the photograph supported his conclusions about the nature of the victim's wounds. While Appellant suggests that the picture of the brain was introduced merely to show that it was swollen due to the strangulation, we disagree. Dr. Wecht indicated that there was an injury to the head consistent with either a punch or her head striking something during a fall. He referenced a hemorrhage on the brain shown in a photograph in order to prove this fact. The pictures of the internal injuries suffered by Rebecca to her chest area were likewise introduced to demonstrate that she either sustained a severe blow in that area or powerfully struck an object. The neck and mouth photographs were displayed to prove that Appellant's strangulation of the victim was particularly brutal.

We have viewed the photographs, and, while they are graphic, we cannot conclude that the trial court abused its discretion in admitting them. They demonstrated the viciousness of Appellant's attack on his wife for purposes of establishing that Appellant acted with specific intent to kill Rebecca. Given that Appellant's final statement to police raised the specter of self-defense, which Appellant exploited during closing remarks, the

ferocity of the beating and wounds suffered by Rebecca became particularly relevant to his specific intent. *Haney*, *supra* at 38 (where defense was that child victim was clumsy and injuries were self-inflicted by accidental falls, "photographs, while troubling to view, were admissible to explain the nature and extent" of the injuries and the severity of the defendant's attack on the boy so as to prove specific intent); *Watkins*, *supra* (no abuse of discretion in admitting photographs of autopsy during forensic pathologist's testimony so that witness could explain his findings to the jury, especially since jury was instructed specifically as to evidentiary use of photographs and not to allow emotional impact of pictures to sway it against defendant).

Appellant also posits that Dr. Wecht's testimony would have been sufficient to establish the nature of the injuries sustained by Rebecca and that the photographs therefore were of limited evidentiary value. Appellant's brief at 10. In *Haney*, *supra*, the defendant raised the same argument, maintaining that the photographs of the dead victim were cumulative to the testimony of the medical examiners. In rejecting that position, our High Court noted:

> This Court consistently has held, however, that "the fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant." *Commonwealth v. Karenbauer*, 552 Pa. 420, 443, 715 A.2d 1086, 1097 (1998) (citation omitted); *See [Commonwealth v.] Johnson*, 615 Pa. [354,] 384, 42 A.3d [1017,] 1034 [(2012] ("Even if the nurse and the pathologist could have testified as to

these injuries, a witness's ability to testify as to the condition of the body does not render photographs *per se* inadmissible.").

***Haney***, ***supra*** at 38.  Hence, we conclude that Appellant is not entitled to a new trial due to the admission of the autopsy photographs.

Appellant's second position is that the trial court improperly instructed the jury that specific intent to kill can be formed in any amount of time.  We first elucidate the appropriate standard of review:

> When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

***Commonwealth v. Roane***, 142 A.3d 79, 95 (Pa.Super. 2016) (citation omitted).

Appellant's complaint concerns a jury instruction given in response to the jury's request that the court re-instruct on the elements of first-degree and third-degree murder.  The Court responded in pertinent part:

> [THE COURT:] I guess to summarize it.  First degree he intended and that intent premeditation it can be any length of time.  It doesn't have to be any particular length of time.  It can be the day before, it could be an hour before, it could be a minute before, it could be two seconds before.  That is first.
>
> . . . .

- 18 -

Does everybody agree to that? Is there anything else?

[DEFENSE COUNSEL]: The intent to kill requires a conscious forming.

THE COURT: The first degree conscious forming of that intent does not require any particular length of time.

N.T. Trial, 6/23-27/14, at 953.

Herein, Appellant objects to the court's suggestion that there is no period confining when specific intent can be formed. However, this statement of the law was correct:

> There are three elements of first-degree murder: (i) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); ***Commonwealth v. Houser****,* 610 Pa. 264, 18 A.3d 1128, 1133 (2011). As set forth in the third element, first-degree murder is an intentional killing, *i.e.,* a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d). "Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." ***Commonwealth v. Drumheller****,* 570 Pa. 117, 808 A.2d 893, 910 (2002). **The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second**. *Commonwealth v. Rivera,* 603 Pa. 340, 983 A.2d 1211, 1220 (2009)[.]

***Commonwealth v. Jordan***, 65 A.3d 318, 323 (Pa. 2013) (emphasis added). Hence, we reject Appellant's position that the trial court erred in instructing the jury that specific intent to kill can be formed in a month, a week, a day, or in seconds.

- 19 -

We now address the appeals pertaining to restitution. The issues involve mandatory restitution, as outlined in 18 Pa.C.S. 1106. "Questions regarding the court's authority with respect to ordering restitution implicate the legality of a sentence. . . . . When a trial court imposes a sentence outside of the legal parameters prescribed by the applicable statute, the sentence is illegal and should be remanded for correction." *Commonwealth v. Burwell*, 58 A.3d 790, 792–93 (Pa.Super. 2012) (citations omitted). Interpretation of § 1106 "also involves statutory construction and is, therefore, purely a question of law; questions of law are subject to plenary and *de novo* review." *Id*. at 793. Section 1106 sets forth in relevant part:

> **(a) General rule.--**Upon conviction for any crime . . . wherein the victim suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.
> . . . .
>
> **(c) Mandatory restitution.--**
>
> (1) The court shall order full restitution:
>
> (i) Regardless of the current financial resources of the defendant, so as to provide the victim with the fullest compensation for the **loss**. . . .

18 Pa.C.S. § 1106 (emphasis added).

The Commonwealth retains the burden of proof to establish its entitlement to restitution. *Commonwealth v. Atanasio*, 997 A.2d 1181,

- 20 -

1183 (Pa.Super. 2010). The record must contain a "factual basis for the appropriate amount of restitution," and the "amount of the restitution award may not be excessive or speculative." ***Id***. It is settled law that "although it is mandatory under section 1106(c) to award full restitution, it is still necessary that the amount of the 'full restitution' be determined under the adversarial system with considerations of due process." ***Id***. (citation and quotation marks omitted).

Herein, the following evidence was adduced at the hearings held on this question. Thomas Anderson was the Commonwealth's sole witness. Mr. Anderson was Rebecca's brother and an attorney employed by the law firm of Thomson, Rhodes, and Cowie, located in Pittsburgh. Mr. Anderson specified and documented that the estate incurred funeral costs in the amount of $14,116.55. Mr. Anderson asked for an additional $46,535.10 in legal fees, reporting that some of the work that resulted in this fee was performed by another lawyer and paralegal in his firm. Mr. Anderson did not supply any proof as to the value of the probate and non-probate assets. Finally, Mr. Anderson requested restitution for various other expenses that he characterized as administrative expenses. Specifically, Mr. Anderson sought reimbursement for time and expenses incurred by Rebecca's father, mother, sister and himself in connection with "care and maintenance of the house" and "dealing with any criminal proceedings that would not have

occurred but for the murder in this case." N.T. Hearing, 8/11/14, at 11. Thus, these expenses were for work that Rebecca's father, sister, mother, and Mr. Anderson performed at 803 Seton View Drive and for time spent attending the criminal trial in the following amounts: $11,080.00 for Rebecca's father, $677.28 for her mother, $4,080 for Kelly Beltz, and $380.00 for Thomas himself. *Id*. at 15. Thus, in addition to the $14,116.55 in funeral expenses, the Commonwealth asked for $62,752.38.

The trial court ascertained that Thomas Anderson personally billed $15,799 of the $46,535.10 for legal services. In addition, "almost $10,000 [was] charged under the heading of Monitoring the Criminal Trial." *Id*. at 20. Mr. Anderson acknowledged that this figure represented charges for going to the present criminal trial, and he maintained that he attended it as a lawyer in order to determine the applicability of the Slayer's Act.[1] The trial court pointed out that all that was needed to trigger that statute was a finding the Appellant was guilty of murdering Rebecca, and it rejected the

_____

[1] That statute provides, "No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following." 20 Pa.C.S. § 8802. A slayer is a "person who participates, either as a principal or as an accessory before the fact, in the willful and unlawful killing of any other person," and property "[i]ncludes any real and personal property and any right or interest therein." 20 Pa.C.S. § 8801.

assertion that the fees that Mr. Anderson charged for attending this criminal trial were necessary to administer the estate.

When asked about the large amount of fees requested, after excluding the $10,000, Mr. Anderson maintained that a significant amount of legal work was needed with regard to distribution of Rebecca's life insurance and pension since the Slayer's Act prevented Appellant from receiving those assets. The trial court again discounted this assertion, noting that the simple fact that Appellant was convicted of first-degree murder herein was sufficient to ensure proper distribution of the pension and life insurance. Mr. Anderson also admitted that the estate never paid the $46,535.10 in legal fees outlined in his submitted bill and that the estate was settled by a family settlement agreement. *Id*. at 23, 22.

The trial court granted restitution for the funeral and burial expenses of $14,116.55, but denied the claim for $62,752.38, including the legal fees in the amount of $46,535.10. In its appeal, the Commonwealth presents this issue: "Where the defendant was convicted of killing his wife, Rebecca Stahl, did the court err in refusing to order the defendant to pay restitution to the estate of Rebecca Stahl for legal fees incurred in administration of her estate?" Commonwealth's brief at 1938 WDA 2014 at 7. In his appeal from the restitution award, Appellant maintains, "Restitution for funeral, cemet[e]ry, and burial expenses cannot be ordered as part of a sentence

pursuant to Section 1106." Appellant's brief at 1937 WDA 2014 at 4. We can readily dispose of Appellant's position since in **Commonwealth v. Lebarre**, 961 A.2d 176, 177 (2008), we specifically held that restitution for funeral expenses incurred for a homicide victim can be awarded to the estate of that victim.

We find it more difficult to decipher the Commonwealth's averments on appeal. Apparently acknowledging that the $46,535 will be paid to Mr. Anderson, a family member, for work performed by himself and members of his law firm, the Commonwealth argues that a family member can be a victim under § 1106. However, we have specifically rejected this position when we held in **Commonwealth v. Langston**, 904 A.2d 917, 924 (Pa.Super. 2006), that: "The mandatory payment of restitution pursuant to Section 1106 of the Crimes Code is limited to the direct victim and not to third parties, including family members, who shoulder the burden of the victim's losses." We therefore disagree with the Commonwealth's assertion that a family member can be a victim under § 1106, as this panel is bound by **Langston**.

Additionally, the Commonwealth fails to acknowledge the weakness involved in Thomas Anderson's claim for legal fees. The trial court specifically discounted Mr. Anderson's position that the $10,000 in "legal fees" that he charged to attend the criminal trial herein could be properly

characterized as associated with the administration of the estate. The trial court likewise refused to credit Mr. Andersons' testimony that large legal fees of $36,535 not associated with his trial attendance were warranted due to complexities associated with the application of the Slayer's Act.

There was a house to sell, an insurance policy to recover, and a death benefit from a pension to obtain. No values were proffered for those assets. The Slayer's Act was triggered upon Appellant's conviction herein, Rebecca's family members did the work necessary to prepare the house for sale, and the estate was settled by a family settlement agreement. Given the evidence presented at the restitution hearing and the trial court's rejection of the reasonableness of nearly all of the legal fees submitted for payment, we conclude that the Commonwealth simply failed to carry its burden of proof that the legal fees were reasonable, as required by the case law.

Finally, and most critically, Mr. Anderson admitted that the estate never paid the $46,535 in fees, and there was no indication that the estate will actually pay them. Section 1106 permits recover only for a loss. Given the facts at issue herein, we believe that there was no loss by the estate because fees in question were not paid.

At 1 WDA 2015, the judgment of sentence is affirmed. At 1937 WDA 2014 and 1938 WDA 2014, the order is affirmed.

Judge Strassburger joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2016